FRED W. JONES, Jr., Judge.
Defendant, Louisiana Farm Bureau Mutual Insurance Company (hereinafter referred to as Farm Bureau), appealed the judgment of the trial court in favor of plaintiff, Commercial Union Insurance Company (hereinafter referred to as Commercial Union), finding that the insureds’ newly purchased automobile was insured pursuant to the newly acquired automobile provision of the insurance policy issued by defendant, in plaintiffs’ action for damages. For the reasons stated herein, we affirm the judgment of the trial court.

Issue Presented

The sole issue presented on appeal is whether the trial court erred in finding that defendant’s insurance policy covering the *719 insureds’ 1977 Oldsmobile also extended liability insurance coverage to the newly purchased 1982 Oldsmobile pursuant to the newly acquired automobile provision of the insurance policy.

Factual Context

The record established that on September 10, 1983, Christine Piker was driving a 1982 Oldsmobile Delta 88 when she ran a stop sign at the intersection of North 5th Street and Hilton Street in Monroe, causing a 1983 Peugeot driven by Van L. Maples to have an accident. At the time of the accident, Commercial Union had issued a policy of automobile liability insurance to Ned D. Wright, the owner of the Peugeot. The Peugeot was being operated by Maples with Wright’s consent. When Piker entered the intersection in disregard of the stop sign, she caused Maples to take emergency evasive action, and in doing so, his vehicle hit a curb causing him personal injuries. As a result of the accident, Commercial Union paid the sum of $15,671.52. Of this amount, $171.52 was paid to Wright as the consequence of property damage to the Peugeot, $2000 was paid to Maples under the medical payments provision of the policy, and $13,500 was paid to Maples under the uninsured motorist provisions of the policy for personal injuries sustained by him as Piker was deemed to be an uninsured motorist.
The 1982 Oldsmobile had been purchased by Christine and Kenneth Piker on August 24, 1983. The Pikers had not obtained any automobile liability insurance policy which specifically covered this automobile until September 20, 1983, ten days after the date of the accident. On the date of the accident, the Pikers had in effect a policy of automobile liability coverage with Farm Bureau on a 1977 Oldsmobile and the Pikers also owned a 1976 Pinto which was insured by this company. The limits of the policy covering the 1977 Oldsmobile were $10,000 per person and $20,000 per accident. On the date the new Oldsmobile was acquired, the Pikers owned a 1962 Scout, a 1972 Volkswagen and a 1977 Buick which were not insured by defendant. The record demonstrated that the 1982 Oldsmobile was purchased as a permanent vehicle and was not intended as a temporary or replacement vehicle.
On September 10, 1984, Commercial Union and Wright instituted this action for damages, naming as defendant Christine Piker. The petition generally alleged that the accident resulting in damages to the Peugeot and Maples was the result of the sole fault of Piker. Commercial Union asserted it had paid $171.52 to Wright and $15,500 to Maples and that these parties had legally and conventionally subrogated it to all rights which they might have against any party responsible. Additionally, Wright suffered the loss of $100, representing the deductible under his policy with Commercial Union, and was entitled to recover same from Piker.
In response, Piker filed an answer and a third-party demand naming as third-party defendant, Farm Bureau. Piker alleged that on the date of the accident there was in existence a policy of automobile liability insurance issued by third-party defendant covering the vehicles owned by Piker and her husband including those acquired in a 30-day period of time. Piker asserted the automobile involved in the accident had just been acquired by her and accordingly, under the terms of the liability insurance policy, she was covered in the event of any accident which would have occurred during that 30-day period.
Farm Bureau filed an answer alleging that the 1982 Oldsmobile was not covered under the terms of the policy because all automobiles owned by the named insureds were not insured by it on the date the 1982 Oldsmobile was acquired. It asserted the Pikers owned three other automobiles on or about August 24, 1983, the date of the acquisition of the 1982 Oldsmobile which was involved in the accident, and these other automobiles were insurable. Thus, it argued that under the terms of the policy which required coverage of all automobiles owned by the named insured on the date of acquisition of the new automobile, there was clearly no coverage.
*720 Commercial Union later filed an amending and supplemental petition naming Farm Bureau as a defendant in the action.
With reference to the automobiles owned by the Pikers, the Pikers alleged that the 1962 Scout, 1977 Buick and 1972 Volkswagen were completely inoperable at the time of the accident. The automobiles did not have current inspection stickers and had not been driven for quite some period of time. The Pikers contended they had given the 1977 Buick to their son-in-law and daughter, James and Terri Rushing, in August, 1983. However, the couple had not removed the car from the Pikers’ home until October, 1983. James Rushing was an automobile mechanic and allegedly had to complete extensive repairs in order to get the car operating.
At the trial on the merits, it was stipulated the suit was strictly between plaintiffs, Commercial Union and Ned Wright and defendant, Farm Bureau, as Christine Piker had commenced bankruptcy proceedings; that the maximum amount at issue was the sum of $10,000; and that the accident was caused by the sole fault of Christine Piker.
The newly acquired automobile provision of the policy provided in pertinent part:
“If the named insured acquires ownership of an additional automobile and so notifies the Company within thirty days following the date of its delivery; and the company insures all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition.... such insurance as is afforded by this policy applies to such other automobile as of such delivery....” (emphasis added)
The policy provided, in pertinent part, the following definition of “insured automobile”:
b) a private passenger, farm or utility automobile, ownership of which is acquired by the named insured during the policy period, provided
(1) it replaces an insured automobile ... or
(2) the company insures under this coverage all private passenger, farm and utility automobiles owned by the named insured on the date of such acquisition and the named insured notifies the company during the policy period or within 30 days after the date of such acquisition....
Most of the evidence at trial centered on the “other” automobiles owned by the Pikers and the condition of those automobiles on the date that the 1982 Oldsmobile was acquired.
Kenneth Piker testified that he had purchased the 1982 Oldsmobile on August 24, 1983. He went by Farm Bureau on two separate occasions in order to obtain insurance for the new automobile but the office was closed. On the date of the accident, Piker was in the hospital after having major surgery and he purchased the policy on the 1982 Oldsmobile following his release. On the date of acquisition of the new Oldsmobile, Piker testified they had insurance with Farm Bureau on two vehicles, a 1977 Oldsmobile and a 1976 Pinto. They had no automobile insurance with any other company.
Piker said the 1977 Buick was given to the Rushings after it had broken down in November, 1982 and his brother decided he did not want the car. Piker testified the car was inoperable when it was donated. Among other things, it needed a complete muffler system, brakes, shocks, replacement of the battery and battery cables and a new set of tires. Piker stated he was unable to get the car to crank and run properly. The tires were flat and in poor condition as the car had sat in the carport for quite some period of time. Piker did not take any action to repair the vehicle or see how much it would cost to put it in running condition since he had accumulated 134,000 miles on it and believed the car was “finished.” After November, 1982, the automobile was simply placed under the carport and never driven again. Piker stated it was his intent never to use the vehicle, again as he did not have the means to repair the car and did not need it for transportation. Piker stated at the time he donated the car to the Rushings he did not know whether it was repairable. The Pik *721 ers gave the automobile to the Rushings in August, 1983, but it remained at the Pikers’ home until October, 1983. He stated they did not give the 1977 Buick to the Rushings because they had acquired a new vehicle but rather it was donated because it had broken down. Piker’s son-in-law was an automobile mechanic and had to work on the automobile before it could ever be removed from the carport. Piker believed a donation deed was executed in October, 1983 when the car was removed by the Rushings. After the repairs, Piker’s daughter drove the vehicle for approximately two and one-half years, accumulating considerable mileage.
With reference to the 1972 Volkswagen and 1962 Scout, Piker testified the vehicles had not been used since 1982. The Volkswagen had “dropped” a valve. When he had it repaired the wrong size piston was installed so that when the vehicle would get warmed up it would lock and could not be driven at all. It was given away as a “junked” automobile. Further, the Volkswagen floorboard was rusted out and had to be propped up with a bar so as to not touch the ground. Piker stated he still had the Scout but it had not been started or repaired. It could not be on the road because it did not have any brake drums. Piker kept both of these vehicles in his back yard and was never able to sell them.
James Rushing testified by deposition that he had worked as a professional automobile mechanic for approximately a year and a half and had worked on cars since he was 16 years old. Rushing stated the Pikers gave him and his wife the 1977 Buick in August, 1983. The car was currently operable and had a current license plate and motor vehicle inspection sticker. When they acquired the automobile it was in very poor condition and he had to work on it at the Pikers’ home in order to get it cranked. Rushing replaced the battery and the battery cables. The fuel line was stopped up and had to be replaced and also the brake fluid was low and had to be replaced. The exhaust pipe had been knocked off the vehicle and this had to be repaired before Rushing could even get it on the road. Rushing also changed the oil, replaced the radiator hoses and believed he had put an alternator on the vehicle. The vehicle required a set of new tires. Rushing testified it took him approximately a month and a half after he got it to his home to finish the work on it. The car required new shocks and work on the transmission. Rushing put a set of brake pads on the vehicle, changed the oil and filter again and worked on the exhaust system. He estimated he had spent approximately $500 on parts and had performed all of the labor for the repairs himself. Rushing said his father-in-law did not have the expertise to get the car in running condition, and in his opinion the automobile in its original condition was a wreck.
After reviewing the evidence, the trial court noted it was stipulated that the 1982 Oldsmobile had been purchased within 30 days of the date of the accident. Therefore, the policy issued by Farm Bureau to the Pikers on other automobiles would have necessarily covered this automobile during this period if all automobiles owned by the Pikers were insured by Farm Bureau. Thus, the trial court found the narrow issue was whether or not the Pikers did in fact own other automobiles and whether or not these other automobiles had to be insured on the Farm Bureau insurance policy in order for that policy to cover the newly acquired 1982 Oldsmobile. The trial court noted that Farm Bureau argued an automobile remained an automobile by definition and if an insured owned an automobile which, though inoperable at the time, was nevertheless repairable, the insured must have that automobile and all other owned automobiles insured by the particular insurer in order for that insurance to cover any newly acquired vehicle. However, the trial court observed that any shell of a vehicle was repairable if one was willing to expend the necessary resources and time to make it operable. The court found the reasonableness and intent of the owner were more important and noted the jurisprudence had repeatedly examined the facts of each case relative to the use and repair of a particular vehicle and the intent of the owner thereof. It did not believe the *722 question to be when does an automobile no longer become an automobile, but rather what was the reasonable intent of the owner with regard to the automobile and/or was the automobile one which a reasonable person would include in a policy of automobile liability insurance.
In examining the facts of this case, the court found with regard to the 1977 Buick that the Pikers no longer considered themselves the owners of that vehicle or at least no longer intended to own it. Although the act of donation had not been completed, the Pikers had no reason to operate, repair or insure this particular automobile. Therefore, for the purposes of the insurance policy, the 1977 Buick could not be considered an owned automobile. The court stated to hold otherwise would require the Pikers to insure a vehicle which they no longer considered theirs and one which was merely sitting at their home waiting to be picked up by the new owners. The court found the 1972 Volkswagen and 1962 Scout were obviously “junked” automobiles and could not be driven. For these reasons, the court found that these two vehicles were not owned vehicles under the terms of the insurance policy.

Legal Principles

An insurance policy is a contract and the rules established for the construction of written instruments apply to contracts of insurance. The intentions of the parties are of paramount importance in interpreting insurance contracts. Their intent is to be determined in accordance with the plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety. An insurance contract should not be given an interpretation which would enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or which would lead to absurd conclusions. While all ambiguities in an insurance contract must be construed in favor of the insured and against the insurer, courts have no authority to change or alter the terms of the insurance contract under the guise of interpretation when such terms are couched in clear and unambiguous language. Dear v. Blue Cross of Louisiana, 511 So.2d 73 (La.App. 3d Cir.1987); Coates v. Northlake Oil Company, Inc., 499 So.2d 252 (La.App. 1st Cir.1986), writ denied, 503 So.2d 476 (La.1987); Pomares v. Kansas City Southern Railway Company, 474 So.2d 976 (La.App. 5th Cir.1985), writ denied, 477 So.2d 1131 (La.1985), and Harvey v. Mr. Lynn’s, Inc., 416 So.2d 960 (La.App. 2d Cir.1982).
In an action on an insurance policy, a party seeking recovery has the burden of proving facts which bring his claims within the coverage of the policy. Oliver v. Saia, 510 So.2d 770 (La.App. 1st Cir.1987), writ denied, 514 So.2d 463 (La.1987) and Hassen v. Professional Investors Life Insurance Company, 503 So.2d 1030 (La.App. 2d Cir.1987).
In interpreting a nearly identical newly acquired automobile provision, this court in Green v. American Home Assurance Company, 169 So.2d 213 (La.App. 2d Cir.1964), found that an automobile which was not actually in use while undergoing repairs did not change its inherent nature nor remove it from the definition as an automobile. In that case, the insured had a policy covering a 1962 Ford Galaxy and recently acquired a Chevrolet which was involved in an accident. The insurer disputed coverage as the insured owned two additional automobiles, a Studebaker and a Jaguar, neither of which was insured by the insurer. The insured testified that neither of the cars had been in operation or in a condition to operate for several months pri- or to the acquisition of the Chevrolet. The Studebaker had no windows, battery or gear shift and the shifting mechanism and bearings were worn out. The Jaguar had no battery or fuel pump, the engine had thrown four rods and the transmission was inoperable. This court found that neither of these cars was in a condition to be operated nor were they insurable automobiles. Thus, the language of the policy requiring that all automobiles owned by the named insured be included within the expressed coverage of the policy did not contemplate a vehicle which a reasonable *723 person would not, on account of its condition, include in a policy of public liability insurance. For those reasons, we concluded that the insured’s policy covered the newly acquired Chevrolet which the insured was operating at the time of the accident.
On rehearing, it was noted that in our original opinion, we had accepted the conclusion that the Studebaker and Jaguar were inoperable and thus the exclusionary endorsement did not apply. However, we found that a review of the record revealed we were in error on this resolution of fact. The insured’s testimony was unsatisfactory, evasive and uncertain, but established that the Jaguar had a current Louisiana license plate and motor vehicle inspection sticker. Further, the insured testified he had performed work on the Jaguar during his entire period of ownership and admitted he had driven it a few weeks following the date of the accident. We found it was very likely that the Jaguar was not operated over a considerable period of time but it was clear that this was only a temporary condition. The car had not been “junked” or abandoned by its owner, it was not in a condition which was beyond repair and, as a matter of fact, it was repaired to an extent which permitted its use. These findings did not justify the conclusion that the automobile was either inoperable or unin-surable. Thus, our conclusion that the language of the policy endorsement, requiring insurance of all owned automobiles, did not apply was erroneous.
See also Lacoste v. Price, 453 So.2d 986 (La.App. 1st Cir.1984); Barnes v. Carmadelle, 424 So.2d 492 (La.App. 5th Cir.1982); Mahaffey v. State Farm Mutual Automobile Insurance Company, 175 So.2d 905 (La.App. 3d Cir.1965), and Ray v. State Farm Mutual Automobile Insurance Company, 152 So.2d 566 (La.App. 2d Cir.1963).

Applicability of Coverage

On appeal, Farm Bureau argues that under the clear and unambiguous terms of the newly acquired automobile provision of the insurance policy, the 1982 Oldsmobile which was involved in the accident was not covered under the automobile liability insurance policy as of the date of the acquisition of that vehicle. The insureds owned three other vehicles which were not insured by Farm Bureau. Defendant argues that these vehicles, although temporarily inoperable, retained their inherent nature as automobiles since they were not junked, abandoned or completely unrepairable. Defendant contends these vehicles were repairable and thus insurable. Defendant particularly argues that the 1977 Buick was repairable and notes the vehicle was eventually repaired and driven for approximately two and one-half years, accumulating considerable mileage. Therefore, defendant contends that at least one other owned automobile, the 1977 Buick, was insurable on the date of the accident.
Defendant asserts that under the clear, unambiguous terms of the newly acquired automobile provision, as interpreted by the jurisprudence noted above, there is a rule that an automobile remains an automobile by definition under the policy, even if it is inoperable, as long as it is “repairable” unless it has been “junked” or abandoned. We disagree.
As noted by the trial court, any shell of an automobile is repairable, thus excluding coverage, if one is willing and able to expend the necessary time and funds to repair it. Therefore, the characterization of the vehicle as being “repairable” should not be an inflexible standard but should instead be based on other considerations including the owner’s intent and his conduct with reference to the inoperable vehicle. We do not read Green v. American Home Assurance Company, supra, to completely preclude a consideration of the owner’s intent. Rather, the jurisprudence has closely examined the peculiar facts of each individual case in determining coverage.
In this case, the evidence established that the three uninsured vehicles owned by the Pikers were inoperable. None of the vehicles had been driven since 1982 and they did not have current motor vehicle inspection stickers. The Scout and Volkswagen *724 were stored in the Pikers’ back yard and the Buick was parked in the carport. The Pikers had tried to sell or give away each of these vehicles. The gift of the Buick was refused by Kenneth Piker’s brother and the vehicle was eventually given to the Rushings. The Volkswagen was eventually hauled off as a “junked” automobile. Each of these vehicles was more than temporarily inoperable but rather would require significant effort and expense to get it in the most basic running condition. Much of the controversy at trial with reference to coverage centered on the Buick since this vehicle was eventually repaired and driven for several years. However, the evidence demonstrated this car was given to an experienced automobile mechanic who was able to make the repairs without incurring any expenses for labor.
Considering the evidence set forth here-inabove, it was established that these vehicles were in need of significant repairs and had been inoperable for a considerable period of time. Therefore, it is appropriate to consider other evidence such as the intent and conduct of the owners of the vehicles.
The fact the Pikers had more than one inoperable vehicle on their premises is of some significance as it demonstrated a tendency to retain vehicles beyond their useful life. This accumulation of inoperable vehicles established a course of conduct whereby the mere retention of ownership of a shell of an automobile did not necessarily mean the Pikers ever intended to repair it. The Pikers were apparently reluctant to haul off or otherwise destroy their inoperable vehicles but rather preferred to sell or give them away. They had never undertaken to perform repairs on any of the vehicles which would indicate they had no intent to repair them.
The Pikers’ intent that the vehicles would remain inoperable was also established by the evidence. They not only testified they had no intent to repair the vehicles, but after the accident they disposed of two of the cars without repairs. In fact, the only vehicle which was ultimately repaired was given away before the accident, although the formalities of the gift had not been concluded.
In summary, considering the significant nature of the mechanical problems which rendered these vehicles inoperable, the period of time during which these cars had been inoperable prior to the date of the acquisition of the 1982 Oldsmobile, the pattern established by the Pikers of retaining inoperable vehicles with no effort to repair them, the conduct of the Pikers in making no efforts to repair the vehicles, the efforts of the Pikers to sell or donate the inoperable vehicles prior to the date of the acquisition of the new vehicle, the disposal of two of the vehicles after the date of acquisition and the failure to repair the third vehicle and the testimony of the Pikers that they never intended to repair any of the vehicles before or after the date of acquisition, we find the trial court did not err in concluding that these three inoperable vehicles were not owned automobiles, so as to exclude coverage under the policy.
As a practical matter, these vehicles created little or no insurable risk. Thus, the Pikers had no reason to insure them or to expect that insurance should be obtained on them.
For these reasons, the judgment of the trial court in favor of plaintiff, Commercial Union Insurance Company, and against defendant, Louisiana Farm Bureau Mutual Insurance Company, is AFFIRMED. Costs of this appeal are assessed to defendant, Louisiana Farm Bureau Mutual Insurance Company.
HIGHTOWER, J., dissents and assigns writtén reasons.